54 N.J. Super. 594 (1959)
149 A.2d 821
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM H. CROLAND AND MARVIN ZALK, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 22, 1958.
Decided March 23, 1959.
*596 Before Judges GOLDMANN, CONFORD and HANEMAN.
*597 Mr. Paul T. Murphy argued the cause for defendant-appellant Zalk (Messrs. Crummy, Gibbons and O'Neill, attorneys).
Mr. Sanford Freedman argued the cause for plaintiff-respondent (Mr. Charles V. Webb, Jr., attorney).
The opinion of the court was delivered by CONFORD, J.A.D.
The defendants Croland and Zalk were convicted of the fraudulent conversion of two sums of money, $7,043.57 and $4,575.88, of the C.J. Simons Corporation, in violation of N.J.S. 2A:102-3. That statute reads as follows:
"Any director, member or officer of any corporation or association who fraudulently takes, misapplies or misuses any money or property of the corporation or association, is guilty of a misdemeanor."
The indictment charges that Croland was secretary and treasurer of the corporation. The prosecution of Zalk was on the theory that he aided and abetted Croland in the crime. Zalk appeals; Croland does not. The main ground of the appeal is that the disbursement of the moneys mentioned was not in fraud of the C.J. Simons Corporation, nor intended to defraud it, and that the court should have directed an acquittal.
Croland had for years been associated as an insurance broker with the well-established Newark insurance agency of C.J. Simons & Company, a corporation entirely owned and controlled by Charles J. Simons. Croland having brought a considerable amount of group insurance business to the concern, he and Simons decided in 1947 to organize a new and separate corporation, to handle group insurance exclusively. Thus they established C.J. Simons Corporation ("Simons Corp." hereinafter). Each was to own 50% of the stock; both were to sign all checks; but complete operational direction of the corporation was rested in the hands of Croland, the group insurance specialist, Simons' time being fully occupied by the business of the other firm. *598 This policy was carried out, Simons doing nothing more than to sign checks. The Simons Corp. prospered, achieving an annual gross premium business of well over $2,000,000 by 1953.
Croland succeeded in writing a considerable amount of group insurance for union welfare funds  a fairly recent development of collective bargaining by which employers pay for the purchase of insurance benefits for employees, the welfare funds being generally managed by boards of trustees divided equally between representatives of the unions and of management. The indictment in the present case arose out of an investigation by the United States Senate in 1955 of certain improper practices in the management of these funds, prominent among which was a so-called "kickback racket" by which the placement of the large and lucrative insurance business arising from these funds was made the means of cash payments to designated beneficiaries in the guise of "commissions" or "administration fees" actually unearned by the payees.
In a voluntary statement under oath given the Essex County Prosecutor's Office by Croland, and introduced by the State with his consent at the trial herein, he explained that in 1950 he became interested in getting trucking welfare fund insurance business and solicited Jacob L. Levey, a Jersey City lawyer (who died in August 1955), therefor. Levey was counsel to trucking management interests. Eventually this led to the Simons Corp. becoming general agent on group insurance for several trucking welfare funds, including the Passaic and Bergen Counties Trucking Employees Welfare Fund ("Passaic and Bergen Fund" hereinafter), the carrier being the Continental Insurance Company, with executive offices in Chicago. The defendant Zalk was the administrator of this and other such funds, paid for his services as such by the fund trustees. The coverage on the Passaic and Bergen Fund continued until the end of the year 1954. Some three to five months after the first premiums were paid, according to Croland's statement, Levey sent for him and told him he would have to pay "administration *599 expenses" and "commissions" to "various individuals." Croland protested that he had done all the work, but was told, "Well, you didn't think for a moment this was all going to be yours," and "Unless you do that, why, you are going to lose the business." Levey said he could get equal amounts from other companies if Croland balked. Croland, feeling "[his] hands were tied," capitulated under the Levey demands.
Levey, so the Croland statement went, designated the amounts and persons to be paid. (It would appear that additional welfare funds beyond the Passaic and Bergen Fund were implicated in these negotiations.) Croland mailed checks to the indicated designees from time to time, usually quarterly. Levey told Croland they were all licensed brokers.
"A year or two" after these practices began Levey for the first time designated Zalk as a payee of commissions and administration expenses on the Passaic and Bergen Fund insurance. Two payments by the Simons Corp. to Zalk, made as a result of these arrangements, a check for $7,043.57 on May 6, 1953, and another for $4,575.88 on August 31, 1953, are the subject matter of the indictment in this case. Zalk was not in fact a licensed broker. According to other proofs in the case, Croland prepared vouchers for these checks, breaking the first payment down to $1,751.12 for "administration" and $5,292.45 for "commission"; and the second one into $1,627.42 for "administration" and $2,948.46 for "commission." The "administration" components were exactly 5% of the premiums, the first for the period December 1952 to March 1953, and the second from April to June 1953, both inclusive. The "commission" items were calculated at the regular rates which would be payable to any broker responsible for forwarding the business to the Simons agency or specified by the purchaser of the insurance. There is uncontradicted testimony in the case that the regular practice of the Simons agency was and is to pay a brokerage commission to any licensed broker specified by an insurance customer, whether or not the broker has had any actual part in effecting the business.
*600 Croland tried to save the Simons Corp. the expense of the "administration" fees paid Zalk by the expedient of reporting to the carrier, Continental Insurance Company, 5% less than the actual number of persons covered by the policy (the premiums being based on the total number covered), thereby reducing the amount of premiums Simons Corp. reported and remitted to Continental by 5% from the amount actually received from the insured fund. When Continental learned of the deception in 1954 and called it to the attention of Mr. Simons he insisted that the Simons Corp. make restitution to Continental, and this was done. This testimony was admitted over the strenuous objection of both defendants that it did not concern the alleged misappropriation of Simons Corp. funds specified by the indictment, but only of Continental Insurance Company funds, and that it was actually done for the benefit of Simons Corp.
The State's main reliance for the proof of fraud of the Simons Corp. was the testimony of Mr. Simons and a Mrs. Small of the Simons office staff. The latter testified that it was normal office procedure for the original voucher to be attached to the check when it was submitted for signature by Croland and Simons, and for the voucher to accompany the check to the payee. Neither Simons nor Mrs. Small could say whether this was actually the case with the two checks here in question. Simons could not remember the checks at all. He apparently signed any Simons Corp. checks prepared by or at the direction of Croland without any question, relying upon him fully, even to the extent of signing such checks in blank on occasion.
Simons testified that he had met Zalk in his office and knew that he was associated with a "union or welfare fund"; that he knew the Simons Corp. was paying commissions on welfare fund group insurance, but not specifically who the brokers were, nor whether the recipients were licensed; that he knew "that it was a part of the business" for "administration fees" to be paid on such insurance, having discussed it with Croland; and that such fees were properly payable to persons not licensed as insurance brokers, "for work which *601 must necessarily be done in connection with the administering of a welfare fund."
The main foundation for the State's case of fraud at the trial was the following testimony by Simons: "Q. If you had known that Mr. Zalk was not a licensed broker, would you have signed a check paying him commissions? [Objections and colloquy.] A. The answer is no, sir."
Simons testified he drew $15,000 in salary from the Simons Corp. in 1953, the year of the payments to Zalk. He never made any criminal claim or charge of fraud against Croland. The trial court disallowed defendants' attempt to show that Simons never made any civil claim against Croland. Simons later purchased Croland's stock interest in the corporation, apparently because of pressure by Continental. But Croland was still associated with him in business at the time of trial.
There was testimony concerning admissions by Zalk during the investigation preceding the indictment from which the jury could have found that he distributed much or all of his receipts from the payments in question to others in the form of cash. There is no evidence whatever, however, that Croland received any of it.
Zalk did not testify in his own behalf. Croland did. He said he made the payments to Zalk at the direction of Levey and that he did so because he believed he had to in order to keep the business. After the payments to Zalk he made other payments at Levey's directions in connection with the Passaic and Bergen Fund to brokers by the name of Chaiet.
Zalk contends that the evidence at the trial did not establish any defrauding of the Simons Corp. by Croland nor any intent by Croland to defraud it; and that he, Zalk, could consequently not properly be found guilty of aiding and abetting Croland in such a crime. If the premise be accepted the conclusion is sound. State v. Marshall, 97 N.J.L. 10 (Sup. Ct. 1922).
There can be no question but that the fraudulent character of the taking or misuse of the corporation's money is an essential element of the crime charged under this statute. State v. Then, 118 N.J.L. 31 (Sup. Ct. 1937), *602 affirmed 119 N.J.L. 429 (E. & A. 1938). The State assigns as evidence of fraud by Croland the designations "commissions" on the vouchers prepared by him accompanying the Zalk checks when submitted to Mr. Simons for signature. This, it is asserted, implied that Zalk was a licensed insurance broker, which was false. Reliance by the Simons Corp. upon these misrepresentations (i.e., by one of the equal one-half owners of the corporation, Mr. Simons) is contended to be established by Simons' testimony that he would not have signed the checks had he known Zalk was not a licensed broker. In our judgment, however, this does not show that the Simons Corp. was induced to part with its funds by the asserted misrepresentation. It is entirely clear from Mr. Simons' testimony that he was fully satisfied to pay the sums of money in question as a matter of good business in order to get and keep the welfare fund account. The only condition he would have insisted upon, as may be inferred from his testimony, is that any part of the payments representing commission go only to licensed brokers, presumably because of his concern that ethical and state regulatory requirements so demanding be complied with. It would seem to the court that when reliance is sought to be shown by the State in a case of asserted fraudulent despoilment of a corporation's property it must be shown to relate to the supposedly defrauded corporation's parting with its property at all in reliance upon the alleged misrepresentation, cf. State v. Lamoreaux, 13 N.J. Super. 99, 103 (App. Div. 1951), rather than to a technical qualification of the payee of the funds having nothing to do with the motivation for the payment per se. The Simons Corp. clearly was not defrauded in this sense.
In any case, however, we are entirely clear that the necessary elements of damage or prejudice to the assertedly defrauded corporation and fraudulent intent on the part of Croland toward that corporation are totally lacking here. We must approach a search of the record for evidence of these essential elements of Croland's (and, consequently, of Zalk's) guilt of the specific crime charged in the indictment *603 with the prefatory observation, necessary only because of the atmosphere in which this case was tried, that the defendants were not on trial for defrauding the Continental Insurance Company or the Passaic and Bergen Counties Trucking Employees Welfare Fund, or for bribing any employees or representatives of the latter, or for violating any statutes or regulations concerning the payment of insurance brokerage commissions to unlicensed persons, or for any other breach of statute or departure from ethics or morals, but only for defrauding the C.J. Simons Corporation by procuring the making of the two specific payments mentioned in the indictments. A defendant cannot be convicted for one crime or offense on the basis of evidence showing only guilt of another. State v. Dancyger, 51 N.J. Super. 150, 160 (App. Div. 1958), reversed on another ground, 29 N.J. 76 (1959).
The criminal statute here involved is essentially concerned with punishing the fraudulent diversion of a corporation's property for purposes other than the uses or purposes of the corporation. This is made even clearer when we examine the language of the predecessor section as it stood prior to the revision of Title 2. This proscribed the fraudulent taking or use of corporate property by a director, member, etc., "for his own use or benefit, or for any use or purpose other than the use or purpose of such corporation * * *," R.S. 2:124-6. The analogy of civil actions for fraud and deceit supports the concept that there is no liability where the injured party cannot show actual damage or injury. 1 Harper & James, Law of Torts (1956), § 7.15, pp. 590-591; 3 Restatement of Law of Torts (1938), § 549, comment (b), p. 110; 37 C.J.S., Fraud, § 41, p. 290; 23 Am. Jur., Fraud and Deceit, § 20, pp. 771-772; Weaver v. Wallace, 9 N.J.L. 251, 252 (Sup. Ct. 1827); Marsh v. Cook, 32 N.J. Eq. 262, 266 (Ch. 1880); Di Bennedetto v. Friedman, 102 N.J.L. 161, 163 (E. & A. 1925); Schroth v. Coal Operators Casualty Co., 7 N.J. Super. 293 (App. Div. 1950). By the weight of authority, criminal statutes in the general field of the fraudulent obtaining of money or property require for conviction of a violation thereof a *604 showing of loss or prejudice to the victim. 2 Wharton's Criminal Law and Procedure (1957), § 602, p. 360; Annotation, 53 A.L.R.2d 1215 (1957); Martin v. State, 200 Miss. 142, 26 So.2d 169 (Sup. Ct. 1946); People v. Holtzman, 272 Ill. 447, 112 N.E. 370, 371 (Sup. Ct. 1916); Roberts v. People, 71 Colo. 198, 205 P. 272 (Sup. Ct. 1922); Bruce v. State, 217 Miss. 368, 64 So.2d 332, 334 (Sup. Ct. 1953); Willis v. State, 205 Md. 118, 106 A.2d 85, 87 (Ct. App. 1954); and see State v. Kaufman, 31 N.J. Super. 225, 229 (App. Div. 1954), modified on other grounds, 18 N.J. 75 (1955) ("it is generally conceded that the crime of false pretenses is not committed by the mere perpetration of a deception, but becomes such an offense when one is prejudiced thereby").
In the case before us there is no evidence whatever which could fairly be taken to indicate that the Simons Corp. sustained any actual or pecuniary loss or damage in the making of the payments to Zalk. It was the State itself which offered the Croland pretrial statement indicating that Croland sent the checks to Zalk as a necessary condition imposed by Levey for retaining the welfare fund insurance. The State offered no proof whatever supporting any different theory for Croland's motive in making the payments. Not only is there an absence of any basis in the record to disbelieve Croland's pretrial statement (and trial testimony) as to why the payments were made, and as to their necessity from the standpoint of the Simons Corp.'s business interests, see Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482 (1956), but the whole background of this case confirms its essential truth. The payment of these "kickbacks" was the price of the continued enjoyment by the Simons Corp. of the lucrative commissions (even after the payments) on this kind of group insurance. The testimony cannot be reasonably interpreted otherwise. These practices went on before the payments to Zalk were made and continued afterwards. Simons knew that this general kind of expense was inseparable from the doing of business with *605 some of the labor welfare funds, including the one here in question. He admitted Croland told him that.
In considering whether there was a fraudulent taking, misapplication or misuse of the Simons Corp.'s money we cannot look at the payments here complained of by the State in isolation from the entirety of the transactions to which they related. The testimony makes it plain that Mr. Simons was willing to go along with Croland's business decision to make these payments in order to get the still substantial residue of the overriding agent's commission on these premiums, less the "administration" expense. The payment of the "commissions" to Zalk did not cost the agency any more than it customarily would allow any broker, at a customer's request, even though the broker had not brought it the business. As to the State's assertion that the "administration" fees were unearned by Zalk, he having been fully paid for his work by his employer, there is no proof at all that Croland represented the contrary to Simons, or that Simons relied upon any such impression in concurring in the payments. The prosecutor avoided asking Simons whether he would have signed the Zalk checks if he knew that the latter's administrative work in connection with the welfare fund account was paid for by the fund trustees. (Contrast his question to Simons as to the contingency of Zalk not being a licensed broker.) And even if there were proof that he would not, and that Croland had represented that Zalk did the work in return for the fee paid by Simons Corp., the fact of the absence of loss or prejudice to Simons Corp. in the transaction as a whole is just as relevant as in connection with the misrepresentation concerning Zalk's not being a licensed broker, as discussed above.
The State argues that the jury did not have to believe Croland's story as to Levey's directions to him. But, as noted above, it was the State which offered Croland's statement as part of its own case. Moreover, if the Levey phase of the case were discarded by the jury as not being credible, it would have no other evidential basis for an hypothesis as to the motivation of the payments to Zalk, *606 except, perhaps, that it was someone other than Levey who designated the "kickback" payees to Croland. This would not help the State's case. It was, of course, the State's burden to establish not only the making of the payments, but also their fraudulent character in respect to Simons Corp. It was not the defendants' burden to disestablish a presumption of fraud. See State v. Lamoreaux, supra. To supply the obvious weakness in its case in this regard the State implies (but never firmly argues) that there was a permissible inference that an arrangement existed between Croland and Zalk for the latter to share his receipts from the Simons Corp. with Croland personally. We need say no more concerning this than that such an hypothesis is not remotely inferable from the proofs by any fair evaluation of the evidence. True, the proofs make it evident that Zalk redistributed all or most of what he got to others, but the only justifiable inference as to this is that those others were specified to Zalk by the same person or persons, whether Levey or anyone else, who arranged for the payments to Zalk in the first place. And there is no rational basis in the case to infer that Croland was one of those so favored. He was in no perceivable sense a natural object of the bounty of the dispensers of the "kickback" largesse. He was, rather, merely an instrumentality for its transmission, with no concern over where it went later.
On the basis of the review of the evidence set out above the State's case was devoid of proof of loss or prejudice to the Simons Corp. in relation to the payments to Zalk. There was no evidence to refute the affirmative showing that these payments were an indispensable part of the price the Simons Corp. had to meet to keep the welfare fund insurance business controlled by Levey. The insurance contracts were renewable annually. There was a renewal of this particular policy for the year 1954, and the proofs require the conclusion that the Simons Corp. would not have obtained it if Croland had not made the payments to Zalk in 1953. Moreover, the Simons Corp. was also realizing business on other welfare funds subject to the same control as this one. It *607 is unquestionable that Croland's dealings with Zalk and Levey (or whoever the directing individual was) covered all such funds and that it was to the net overall financial advantage of Simons Corp. to make the payments demanded.
Apart from the question as to the absence of prejudice or loss to Simons Corp., the proofs cannot be evaluated to yield any fair inference of an intent by Croland by these payments to defraud the Simons Corp. All the reasonably possible inferences are to the contrary. He made these payments in order to serve the pecuniary welfare of the firm, not to defraud it. He even tried to defraud the Continental Insurance Company in the interests of diverting part of the burden of these payments from the back of the Simons Corp. But, as already indicated, that is not the offense for which he or Zalk are here to be judged. Yet the evidence thereof, along with the general aura of wrongdoing in other respects, probably influenced the verdict of the jury against both defendants.
Our conclusion is that the proofs were not sufficient to have permitted a finding of guilt as to Croland on the crime charged in the indictment. It must therefore follow, for the reasons stated above, that the conviction of Zalk as an aider and abetter must be reversed as devoid of an essential foundation.
Other grounds of appeal have been argued on behalf of the appellant, one or two of them of some persuasiveness, but we need not pass upon them in view of our conclusion that there must be a reversal for the basic reason indicated above. There being no reason to anticipate that a retrial could supply the essential missing elements for a showing of fraudulent conversion of the money or property of Simons Corp. by either of the defendants, cf. State v. Samurine, 27 N.J. 322, 324 (1958), and the proofs here adduced so abundantly demonstrating the contrary, we direct a remand and entry of a judgment of acquittal in favor of the defendant Zalk, who is the sole appellant before us.
Reversed.